GUARANTEE VETERINARY CO. et al. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Second Circuit. November 6, 1922.)

No. 8.

1. Trade-marks and trade-names and unfair competition ⬤➡80½, New, vol. 8A Key-No. Series—Three analyses held to sustain finding of Commission that product did not contain advertised ingredients.

Where three analyses of samples of a product, one of which was furnished by the seller and the other two purchased in the open market, all showed that the product lacked 10 of the 16 ingredients stated in the advertisements thereof, and there was no evidence to the contrary, nor offer to submit other samples for further analysis, the finding of the Commission that the product, some of which was admittedly shipped in interstate commerce, did not contain the advertised ingredients, was sustained by the presumption that the samples analyzed were fair samples, so as to be conclusive under Federal Trade Commission Act, § 5 (Comp. St. § 8836e).

2. Trade-marks and trade-names and unfair competition ⬤➡80½, New, vol. 8A Key-No. Series—Evidence held to sustain finding advertisement government had adopted product was false.

The Federal Trade Commission's finding that an advertisement that the government had adopted the product advertised was false was sustained by proof that the only purchase of the product by the government was permission given by the government to the manufacturer of the product to substitute some of it for the manufacturer's own product, marketed under another name, which had been sold to the government.

3. Trade-marks and trade-names and unfair competition ⬤➡80½, New, vol. 8A Key-No. Series—Voluntary discontinuance of practice does not prevent Commission from issuing order.

The fact that the company had discontinued the publication of a false advertisement that the government had adopted its product before the complaint was filed against it before the Federal Trade Commission, does not deprive the Commission of authority to command the company to desist from such advertisement, since it is not obliged to assume that the false publication would not be resumed.

4. Trade-marks and trade-names and unfair competition ⬤➡80½, New, vol. 8A Key-No. Series—Commission has discretion as to the order against company using false advertisement.

Where the testimony showed conclusively that a company had published advertising matter containing false and misleading statements, which it circulated in several states, and that it sold its product in interstate commerce, it was a proper exercise of the Commission's discretion to command the company to desist from publishing such advertisement.

5. Trade-marks and trade-names and unfair competition ⬤➡80½, New, vol. 8A Key-No. Series—Manager of common-law trust cannot complain he was made a party.

Even though the manager of a common-law trust, which was engaged in unfair competition in interstate commerce, was not individually engaged in such commerce, and was not a necessary party to proceedings against the company before the Federal Trade Commission, he cannot complain that he was made a party.

Petition to Review Order of the Federal Trade Commission.

Proceeding under the Federal Trade Commission against the Guarantee Veterinary Company and George L. Owens. On petition by the company to revise an order of the Commission commanding it to desist from certain advertising. Order affirmed.

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Will H. Krause, of Washington, D. C., for petitioners.

W. H. Fuller and I. E. Lambert, both of Washington, D. C., for respondent.

Before ROGERS and MANTON, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

ROGERS, Circuit Judge. This proceeding brings before us for review an order, entered by the Federal Trade Commission, directing the petitioners to desist from certain unfair methods of competition. The Guarantee Veterinary Company is an association in the form of a common-law trust, and has its principal office and place of business in the city of Chicago in the state of Illinois. George L. Owens is the controlling and managing trustee. They are engaged in the use of salt in the form of blocks for the use of live stock under the brand name "Sal-Tonik" in the several states of the United States.

It appears that the Federal Trade Commission, proceeding under the Act of September 26, 1914, commonly known as the Federal Trade Commission Act (38 Stat. 717, c. 311 [Comp. St. §§ 8836a–8836k]), on September 2, 1919, issued a complaint against the petitioners in which it averred that they are engaged in interstate commerce in the sale of salt in the form of blocks for the use of live stock under the brand of "Sal-Tonik" in direct competition with other persons, copartnerships, and corporations also engaged in the sale of block salt for the use of live stock; that in connection with the sale of said "Sal-Tonik" blocks they had been publishing and distributing advertising matter containing false and misleading statements concerning the said "Sal-Tonik" blocks. And the complaint alleged that among the false and misleading statements which the petitioners put forth in their advertising matter were representations and implications to the effect that the "Sal-Tonik" blocks contained certain medicinal ingredients; that they operated a number of factories in various parts of the United States, the total product of one of which was purchased, and thereby indorsed, by the Quartermaster's Department of the United States Army, and that the petitioners owned and operated certain large and expensive machinery necessary for the manufacture of the said "Sal-Tonik" blocks; and that all of this was designed to and did mislead the purchasing public into the belief that the petitioners' product possessed certain unique and beneficial characteristics, and tended to secure for the product an undue preference over the product of competitors.

The complaint was duly served upon the petitioners, who filed their answer thereto on October 11, 1919. Notice of the taking of testimony was given, and testimony was taken on September 9, 1920, and on December 15, 1920. On June 8, 1921, the Commission filed its findings as to facts and conclusion and on the same day entered the order to cease and desist. On July 18, 1921, the petitioners filed their exceptions, and on December 13, 1921, the Commission filed modified findings and a modified order.

The Commission has made the following findings of fact:

"(1) That the respondent the Guarantee Veterinary Company is an association in the form of a trust, having its principal office and place of business in

the city of Chicago, state of Illinois, of which the respondent George L. Owens is the controlling and managing trustee, and that the respondents are now and for more than two years last past have been engaged in the sale of salt in the form of blocks, for the use of live stock, under the brand name 'Sal-Tonik,' in and among the several states of the United States and the District of Columbia, in direct competition with other persons, copartnerships, and corporations also engaged in the sale of block salt for the use of live stock.

"(2) That during the years 1918 and 1919 the respondents printed and caused to be circulated, in and throughout the various states of the United States, circulars in which it stated that its product, Sal-Tonik, contained the following ingredients: Sulphate of iron (redried), carbonized peat, charcoal, tobacco, quassia, sulphur, gentian, pure salt, chloride of magnesia, Epsom salts, Glauber's salts, bicarbonate of soda, oxide of iron, mineralized humoides, American worm seed, Levant worm seed, capsicum (red pepper)—when in truth and in fact respondents' product, Sal-Tonik, did not contain all of said ingredients, and did not contain carbonized peat, charcoal, tobacco, quassia, sulphur, gentian, mineralized humoides, American worm seed, Levant worm seed, or capsicum (red pepper).

"(3) That prior to the organization of the respondent Guarantee Veterinary Company, in the year 1918, the respondent George L. Owens caused to be organized the Guarantee Swine Veterinary Company, a corporation organized under the laws of South Dakota, and the Guarantee Serum Company, a corporation organized under the laws of Iowa, in both of which corporations the respondent George L. Owens was the largest stockholder, and of which he was the controlling manager and president.

"(4) That said Guarantee Serum Company was owned and operated by said Guarantee Swine Veterinary Company; that later the word 'Swine' was dropped from the corporate name, and the owning and operating company became the Guarantee Veterinary Company, Incorporated; that said Guarantee Veterinary Company, Incorporated, succeeded to all property, assets, and rights of both the said Guarantee Serum Company and the said Guarantee Swine Veterinary Company, and that later the assets and rights of the said Guarantee Veterinary Company, Incorporated, were assigned or surrendered to the Guarantee Veterinary Company, a common-law trust; that George L. Owens was the principal stockholder and president of the Guarantee Serum Company, the Guarantee Swine Veterinary Company, and the Guarantee Veterinary Company, Incorporated, and is the controlling and managing trustee of the Guarantee Veterinary Company, a common-law trust; and that all these corporations and the trust and George L. Owens, first as president and later as trustee, caused to be manufactured and sold, and are now causing to be manufactured and sold, in interstate commerce, the article known and designated Sal-Tonik.

"(5) That during all the time of the existence of the said Guarantee Serum Company, the said Guarantee Swine Veterinary Company, the said Guarantee Veterinary Company, Incorporated, the said Guarantee Veterinary Company, a common-law trust, George L. Owens, as the principal stockholder and president of the first three named corporations and as trustee for the last named, a common-law trust, was advertising and representing, or causing to be advertised and represented, to customers and dealers in said Sal-Tonik that their product, Sal-Tonik, contained substantially the following ingredients: Sulphate of iron (redried), carbonated peat, charcoal, tobacco, quassia, sulphur, gentian, pure salt, chloride of magnesia, Epsom salts, Glauber's salts, bicarbonate of soda, oxide of iron, mineralized humoides, American worm seed, Levant worm seed, capsicum (red pepper)—when in truth and in fact respondent's product, Sal-Tonik, did not contain all of said ingredients, and did not contain carbonized peat, charcoal, tobacco, quassia, sulphur, gentian, mineralized humoides, American worm seed, Levant worm seed, or capsicum (red pepper).

"(6) That during the years 1918 and 1919 respondents advertised in the Co-operative Manager and Farmer (Commission's Exhibit No. 10), a magazine published at Minneapolis, Minn., which had a general circulation through the medium of the mails and other distributing agencies in and throughout various states and territories of the United States and the District of Columbia, and

also by circulars prepared and printed by respondents, which they caused to be circulated throughout various states and territories of the United States and District of Columbia, the following:

"'U. S. Government Adopts Sal-Tonik.—The Quartermaster's Department of the U. S. Army has adopted Sal-Tonik and purchased our entire Southern output for use in the U. S. Cavalry. ＊ ＊ ＊

"'The U. S. Army used Sal-Tonik, as is shown by a letter which appears below, written by the assistant veterinarian of the U. S. Army at Camp Johnston. ＊ ＊ ＊

"'Camp Joseph E. Johnston, Fla., January 25, 1919.

"'Guarantee Veterinary Company, Chicago, Illinois. To Whom It May Concern: While acting as 2d Lt. Vet. U. S. A. Auxiliary Remount Depot No. 333, Camp Joseph E. Johnston, Florida, I had the opportunity of recognizing the value of Sal-Tonik. Large numbers of animals were kept in corrals in this camp and naturally much sickness would be expected; however, I noticed that where the animals had access to Sal-Tonik they improved in flesh and vitality. There was a very small percentage of digestive disturbances, such as indigestion, colic, impactions, and diseases of systemic origin.

"'Having recognized the value of Sal-Tonik, I highly recommend it as an efficient medicinal salt of superior quality.

"'[Signed]     J. F. Swain,

"'2d Lt., Vet. U. S. A. Auxiliary Remount

"'Depot 333, Camp Joseph E. Johnston.'

"That the Palestine Salt & Coal Company, of Palestine, Texas, made salt blocks for respondents; the respondents furnishing the medical ingredients, and the Palestine Salt & Coal Co. furnishing the labor and salt. That the Quartermaster's Department of the United States Army purchased in the month of December, 1917, 1,200 blocks of Sal-Tonik at Palestine, Texas, from the Palestine Salt & Coal Company, who were agents for the respondents, and that this one purchase was the only purchase of the respondent's product made by the United States government. That the United States government did not adopt Sal-Tonik. That Mr. J. F. Swain was not assistant veterinarian of the United States Army at Camp Johnston, and at the time the above letter was written he was not a 2d Lieutenant in the United States Army, nor was he located at Camp Joseph E. Johnston, Fla."

After making the above findings as to the facts, the Commission made the following conclusion:

"That the methods of competition set forth in the foregoing findings as to the facts are, under the circumstances set forth, unfair methods of competition, in violation of the provisions of section 5 of an act of Congress, approved September 26, 1914, entitled 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes.''

Thereupon it issued the following order:

"It is ordered that the respondents, Guarantee Veterinary Company and George L. Owens, trustee, their officers, agents, servants, and representatives, do cease and desist, directly or indirectly from publishing or causing to be published or circulated throughout the various states of the United States, the territories thereof, the District of Columbia, and foreign countries, advertisements, circular letters, or other printed matter whatsoever wherein it is falsely stated, set forth, or held out to the general public that the respondents' product, Sal-Tonik, contains carbonized peat, charcoal, tobacco, quassia, sulphur, gentian, mineralized humoides, American worm seed, Levant worm seed, or capsicum (red pepper), or any other ingredients, medical or otherwise, if said Sal-Tonik does not then, in fact, contain each and all of the ingredients which are stated in the advertisement to enter into its composition; from publishing and circulating, or causing to be published and circulated, throughout the various states of the United States, the territories thereof, the District of Columbia, and foreign countries, advertisements, circulars, folders, letters, or any other printed or written matter whatsoever, wherein it is falsely stated, set forth, or held out to the public:

"(1) That the United States government, or any department, branch, or agency thereof, has adopted respondents' product, Sal-Tonik.

(2) That respondents have sold their entire Southern output to the United States government, or to any department, branch, or agency thereof.

"From using, as an advertisement of their product, Sal-Tonik, a certain letter, dated January 25, 1919, and signed by J. F. Swain, purported to be at the time of signature a second lieutenant in the United States Army, at Camp Joseph E. Johnston, Florida. .

"It is further ordered that the respondents, the Guarantee Veterinary Company and George L. Owens, trustee, shall, within 60 days after the service upon them of a copy of this order, file with the Commission a report in writing setting forth in detail the manner and form in which it has complied with the order to cease and desist hereinbefore set forth."

The Federal Trade Commission Act in section 5 provides that—

"The findings of the Commission as to facts, if supported by testimony, shall be conclusive." 38 Stat. 720 (Comp. St. § 8836e).

We have, therefore, examined the transcript of record, which has been filed in this court, for the purpose of determining whether the testimony before the Commission supports the findings. It appears that the Guarantee Veterinary Company admitted in its answer that it was engaged in interstate commerce. It, however, asserts that no proof was ever made that any Sal-Tonik claimed to have been analyzed ever moved in interstate commerce, or that said blocks were made either for or by the Guarantee Veterinary Company, or George L. Owens, nor was it shown or proven that any competitors ever made or sold any medicated salt block, nor was it shown that George L. Owens individually was ever engaged in interstate commerce at any time.

The transcript of record shows that the petitioners prepared and sent out to prospective customers in various states in the latter part of the year 1918, and the earlier part of the year 1919, an advertising circular which stated that "Sal-Tonik" contains the following ingredients:

"Sulphate of iron (redried), carbonized peat, charcoal, tobacco, quassia, sulphur, gentian. pure salt, chloride of magnesia, Epsom salts, Glauber's salts, bicarbonate of soda, oxide of iron, mineralized humoides, American worm seed, Levant worm seed, capsicum (red pepper)."

The statement contained in the circular sustains that part of finding No. 1 as to the advertising circulars which the petitioners circulated, setting forth the ingredients of the product Sal-Tonik. It also appears from the transcript that three different analyses were made of the petitioner's product—the first, in June, 1916, from a sample furnished by the petitioners; the second, in February, 1919, from a sample purchased on the open market which was the product of petitioners; and the third, in December, 1919, from a sample purchased on the open market, which also was the product of petitioners. This last analysis was made by the Acting Chief Chemist of the United States Department of Agriculture. An expert chemist in the Department of Agriculture, who had studied and compared all three of these analyses, testified that they did not show any of the following ingredients: Carbonized peat, charcoal, tobacco, quassia, sulphur, gentian, mineral humoides, American worm seed, Levant worm seed, capsicum (red pepper). He further testified that "Sal-Tonik" was just salt with its impurities and coloring matter.

The petitioners advertised in their circulars that 16 ingredients entered into the manufacture of their blocks of "Sal-Tonik," and the chemical analyses proved show no trace of 10 of them. This is an excerpt from the testimony:

"Question. Mr. Murray, is it not a fact that this product is merely salt with a little coloring matter?

"Answer. Essentially that; nearly all salt contains more or less impurities, and this is colored distinctly red by the iron oxide.

"Question. And that is about all this product is, just salt with its impurities and coloring matter?

"Answer. Essentially that; yes.

"Question. That is what the different analyses show?

"Answer. The impurities would be a little greater than you would get in first-class table salt. The Bureau of Chemistry's analysis shows 2 per cent. of sodium sulphate. That is much more than you would get in good table salt."

[1] The petitioners contend, however, that the "Sal-Tonik" blocks might contain all the ingredients as advertised, and yet all the ingredients might not appear in any of the different analyses which were introduced in evidence by the Commission. This might be possible, but is not probable. The three analyses which were introduced in evidence stand undisputed and uncontradicted. The petitioners might have submitted samples of their product for analysis, and offered evidence to rebut that produced before the Commission; but they did not choose to do so. The presumption is that the testimony presented is true; no proof having been introduced to overcome it. There is no evidence to show that the specimens taken for analysis were not fair or typical ones, and the question whether the ingredients which were not detected upon the chemical analysis were in some other part of the block from which the specimen was not taken, and failed to be detected on account of improper mixing, is one of fact on which the decision of the Commission should be followed.

The petitioners object to finding of fact No. 6. An examination of the transcript, however, satisfies us that the finding is supported by the testimony. It appears conclusively that Swain, the writer of the letter set forth in the finding, never was assistant veterinarian at Camp Joseph E. Johnston and that he had not been at the camp since December 11, 1918. That he had been discharged from the army long before the letter of January 25, 1919, was written, and that he was not at that time connected with the army in any way also is beyond question.

[2] The circumstances connected with the purchase of "Sal-Tonik" by the government are disclosed in a letter written to the Guarantee Veterinary Company by the Palestine Salt & Coal Company, dated January 23, 1917, and which is in the transcript. The letter shows that the Palestine Salt & Coal Company were themselves the manufacturers of a medicated block, and had arranged to sell their own product to the United States government at $13.40 per ton; that on December 23, 1917, a government inspector came to the Palestine plant to inspect their blocks. At that time 1,200 blocks, which the Palestine Company had manufactured for the Guarantee Veterinary Company, were on hand, and the Palestine Company wanted "to have them out of the way," and

it was suggested by the latter that they could turn these blocks belonging to the Guarantee Veterinary Company in on the contract which it, the Palestine Company, had with the government; the blocks having been held so long in the Palestine's warehouse that they were being damaged. This was assented to, and the 1,200 blocks were turned in by the Palestine Company on its contract. There is no evidence whatever that the United States government ever bought any "Sal-Tonik" blocks, other than those mentioned above. This was all the basis there was for the advertisement that "Sal-Tonik" had been adopted by the Quartermaster's Department of the United States Army and that it had purchased the entire Southern output for use in the United States Cavalry.

The advertisement was unquestionably false and misleading. The United States government never adopted the respondent's product, never bought any Sal-Tonik blocks, other than those mentioned above, and which were taken over by the government to accommodate the Palestine Company, and to get them out of its warehouse and out of its way. And it does not appear that the respondent at any time ever had a contract of any kind with the government of the United States. Our conclusion is that finding No. 6, like finding No. 2, is amply sustained by the evidence.

It is not necessary for us to comment upon the other findings of fact. It is enough to say that we have read all the testimony the Commission had before it, and it amply sustains all the findings the Commission made.

[3] The Commission's order, among other things, requires the petitioners to cease and desist from publishing and circulating any printed matter wherein it is falsely stated that the United States government, or any department, branch, or agency thereof, has adopted respondent's product, Sal-Tonik. It appears that, for several months before the complaint herein was filed against them, the petitioners had voluntarily ceased to use the word "adopted" in their advertisements and circulars, and inserted in lieu thereof the word "purchased." Because of this voluntary discontinuance of the word "adopted," prior to the filing of the complaint, it is urged that this part of the order to cease and desist is unjustifiable and erroneous.

Mr. Kerr lays it down as a rule in regard to bills to restrain the violation of trade-marks that the owner of a trade-mark, where the mark has been illegally taken by another, is not bound to rely upon his assurance or promises not to repeat the illegal appropriation of the mark, but is entitled to the protection of the court by injunction. Kerr on Injunctions (4th Ed.) 350. Mr. Nims, in his work on Unfair Competition, at section 372, states that the fact that defendant has ceased to commit infringing acts is no reason why an injunction should not issue.

In Saxlehner v. Eisner, 147 Fed. 189, 191, 77 C. C. A. 417, 419, which was brought for an infringement of a trade-mark it appeared that all use of the infringing bottles had ceased three weeks before the suit was brought. This court, speaking through Judge Lacombe, said:

"In view of the past conduct of defendants, complainant might fairly aver an apprehension that they would in some way continue the old infringement or concoct some new one, even though the company itself were enjoined. The circumstance that since that time they have not in fact infringed is not controlling."

The injunction granted below was sustained. It is to be observed, however, that this is not a suit to restrain the infringement of a patent, or a trade-mark or copyright, but that it is a proceeding under the Federal Trade Commission Act. The language of the act therefore must be considered. Section 5 of the act declares that:

"Whenever the Commission shall have reason to believe that any such person, partnership, * * * *has been* or is using any unfair method of competition in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint. * * *"

In view of this language of the statute, we are unable to say that the language of the order was used improvidently and was beyond the Commission's authority. In Sears, Roebuck & Co. v. Federal Trade Commission, 258 Fed. 307, 310, 169 C. C. A. 323, 6 A. L. R. 358, it was insisted, as here, that the injunctional order was improvidently issued, because before the complaint was filed and hearing had the petitioner had discontinued certain methods complained of. In that case, unlike this, the petitioner had stated in its answer that it had no intention of resuming them. The Circuit Court of Appeals for the Seventh Circuit, notwithstanding these facts, sustained the right of the Commission to make the injunctional order, and said:

"No assurance is in sight that petitioner, if it could shake respondent's hand from its shoulder, would not continue its former course."

[4] The testimony shows conclusively that the petitioners had been publishing advertising matter containing false and misleading statements and had used an unfair method of commerce, and we think the Commission was quite within its right in issuing the order in the form it did. In such cases the Commission must exercise its discretion in view of all the circumstances.

[5] Before bringing this opinion to its conclusion, we perhaps should refer to the fact that one of the petitioners, George L. Owens, moved the Commission to strike his name from the proceeding on the ground that he individually is not now and never was engaged in interstate commerce, and never did any advertising of any kind individually. It is undoubtedly true that George L. Owens was not a necessary party to this proceeding. But the evidence shows that he is, and has been since its organization, the president or trustee and absolute manager of the Guarantee Veterinary Company. He has no right, therefore, to complain because he was made a party to the proceeding.

The order of the Commission is affirmed.