## NEW DEPARTURE MFG. CO. v. ROCKWELL–DRAKE CORPORATION et al.

(Circuit Court of Appeals, Second Circuit. December 29, 1922.)

No. 95.

1. Patents ☞312(3)—Breach of contract as defense to suit for infringement.
    Evidence *held* insufficient to show a mutual mistake in a contract between one of the defendants and complainant corporation, of which such defendant was at the time an officer and large stockholder, which contract involved the assignment of patents by defendant to complainant and his continued employment by complainant, or to have any breach of the contract by complainant available to defendants as a defense to a suit for infringement of one of the assigned patents.

---
☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Infants ⊜⟶57(2)—Assignment by minor valid, where not disaffirmed.**

An assignment of a patent application by a minor *held* valid, where not disaffirmed by the assignor within lapse of ten years after he attained his majority.

3. **Infants ⊜⟶58(1)—Right to disaffirm contract personal to minor.**

The right to disaffirm a contract made during minority is personal to the minor, and the validity of the contract cannot be attacked by third persons on the ground of his minority.

4. **Infants ⊜⟶57(1)—Acts of minor assignor after majority held affirmance of assignment.**

A minor assignor of an application for patent *held* to have affirmed the assignment by actively assisting the assignee in obtaining the patent after attaining his majority.

5. **Infants ⊜⟶57(1)—Less formal acts required for affirmance of contract than for avoidance.**

Less formal acts will suffice for affirmance of a contract made by a minor than would be required for its avoidance.

6. **Patents ⊜⟶287—Officer of corporation not chargeable with its infringement, unless he acts beyond the scope of his office.**

To charge a corporate officer with personal liability for its infringement, it must be shown that he acted beyond the scope of his office.

7. **Patents ⊜⟶287—Officer of corporation held not chargeable with its infringement.**

That a corporation may, by receiving the assignor of patents into its service, be estopped to contest their validity, does not make such assignor liable for its infringement of the patents.

Appeal from the District Court of the United States for the District of Connecticut.

Suit in equity by the New Departure Manufacturing Company against the Rockwell-Drake Corporation, the Marlin-Rockwell Corporation, and Albert F. Rockwell. Decree for complainant, and defendants appeal. Reversed as to defendant Rockwell, and affirmed as to the other defendants.

For opinion below, see 270 Fed. 219.

In form this is the usual suit upon a patent owned by plaintiff and alleged as infringed by defendants. Patent is 1,193,071, granted August 1, 1916, on the application of Hugh Rockwell. The defense admitted that both corporate defendants had made and sold the patented device, but averred right so to do by reason of what is in substance a plea of confession and avoidance. This defense may be said to rest on two supports: (1) The history of the plaintiff, and its contractual relations with the defendant Rockwell, taken in connection with his remarkable share in the establishment and development of plaintiff's business; and (2) the infancy of Hugh Rockwell, the inventor of the patent in suit, at the date of assignment to plaintiff of his application.

Plaintiff corporation grew out of a partnership in which, as long ago as 1888, defendant Rockwell was a leading, if not the principal, figure. The business was incorporated in 1889, and established and rapidly enlarged a continuously profitable business in bicycle improvements and accessories. By 1903 more than one-half of the outstanding share capital represented capitalized earnings and not original subscriptions, while the accumulated surplus was, to say the least, of a most satisfactory nature. During all this period defendant Rockwell was an officer of the plaintiff, and usually, if not continuously, its general manager. It is asserted, and may be admitted for the purposes of this case, that plaintiff's business, in 1903

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and for some years thereafter, largely, if not principally, consisted in exploiting patented devices either invented or improved by defendant Rockwell, who personally supervised the manufacture thereof.

On July 1, 1903, an elaborate written agreement was executed between plaintiff and Rockwell. By it Rockwell made plaintiff his exclusive licensee in respect of certain described inventions and improvements in "brakes or coaster brakes," and secured for himself royalties thereupon. But further the contract required that Rockwell should thereafter convey to the plaintiff "absolute title" to all the other inventions or improvements that might thereafter be "invented and acquired" by him, and further that he would, "immediately upon so inventing or acquiring any such other inventions," impart to the plaintiff "full information of the manner of using and constructing the same." In consideration of this engagement plaintiff agreed, whenever and as soon as the profits arising from manufacture under "any of the future inventions" of Rockwell not relating to brakes or coaster brakes, reached a named figure, to pay a substantial royalty on all goods so manufactured "which shall embody" any of · said inventions.

Finally defendant Rockwell agreed "to remain in the employ of [plaintiff] and use his best efforts in the interests of [plaintiff] so long as [plaintiff] shall elect, and shall receive a salary for ·his services, exclusive of any sum or sums which may be. paid him hereunder as royalties," of $5.000 a year; but (continued the contract) "should the said Rockwell voluntarily leave the employment of [plaintiff] for any other reason than the nonpayment of his royalties and salary as provided herein, then and in that event all payments to him under this agreement whether as royalties or salary shall cease and determine"—leaving, however, perfect title in plaintiff to the patents that might be obtained by it under said agreement.

For 10 years after the making of this contract—i. e., until the end of 1913; Mr. Rockwell's own statement may be accepted (for the purposes of decision) to the effect that he continued in the general management of plaintiff's business—he was both president and "general manager," and that business continued to enlarge and to pay dividends, both in cash and stock, to its shareholders. It is evident from this record that, as the business enlarged and the share stock increased, the concern changed wholly from the "close" or "family" corporation of early days to a concern of widely extended geographical interests and multiplied shareholders. In or by 1913 the plaintiff had suffered considerable losses, arising from the acquisition of another corporation and through it of engagement in an unprofitable taxicab venture. Business was depressed, and evidence is ample that, although sound enough on the manufacturing side, the business of the company was too extended for its cash resources.

Apparently the directors felt that the time had come when a financier, rather than an inventor, should be in general charge of its business, and Mr. Rockwell was first relieved (by 1914) of his office of general manager, and next of that of president. Finally he was relegated to take charge of the patent department of the plaintiff. Then ensued objections as to the amount of royalties accruing to him, the new control asserting that royalties had been erroneously paid on devices which did not "embody" Rockwell's inventions; whereupon .offers of admitted royalty payments were made, coupled with a demand that Mr. Rockwell should accept the same in full settlement from time to time, thereby acquiescing in the new ruling as to what patented devices did and what did not "embody" his inventions. He refused this concession, and, after many such offers of payment had been made, agreed in writing that he would be considered as declining any and all such tenders. In December, 1915, Mr. Rockwell's last term as president of plaintiff came to an end, and he was not re-elected; but it is not denied that he remained entitled to his salary of $5.000 per annum, though there came a time (the record does not show exactly when) when he ceased to draw it, and in the same December, 1915, he became president of the Marlin Arms Corporation, a company formed to manufacture machine guns.

The issue raised by answer and based on these facts is substantially that the contract of July 1, 1903, was made in order "to secure a permanent continuance of the benefits the plaintiff was enjoying as a result of the ability of [Rockwell] to meet the needs of its developing manufacturing business by the inventions he was able to make." Further, that it was a "vital part of the mutual understanding at this time [i. e., 1903] between plaintiff and [Rockwell] that the latter was to continue to manage the detailed development of the plaintiff's manufacturing business as theretofore." But by "mutual mistake of the parties the actual agreement between them was not expressed with unequivocal fullness," but was through such mutual mistake "expressed only by the phrase that [Rockwell] is to remain in the employ of plaintiff and use his best efforts in the interests of [plaintiff] so long as [plaintiff] shall elect."

It is then pleaded that by the exclusion (as above recited) of Mr. Rockwell from the active management of plaintiff he was, in violation of the true intent and purpose of the agreement of 1903, "wrongfully deprived of any substantial influence over the management or development of the plaintiff's lines of manufacture, to the fraudulent end that plaintiff's lines of manufacture should be so developed as to minimize the use of said defendant's inventions and the amount of royalty payable to him." Thus this defense tenders the issue that by reason of plaintiff's conduct to Rockwell he, through such corporations as he chose to favor (i. e., the corporate defendants), was equitably entitled to use the inventions conveyed by him to plaintiff, and more particularly the invention of Hugh Rockwell in suit.

The facts with regard to Hugh Rockwell's infancy are that, when in 1910 the application for the patent in suit was filed, the patentee (the son of defendant Rockwell) was 20 years old. He was and had been for some time in the employment of plaintiff, of which his father was then general manager. The drafting of his application and all the soliciting work on this patent was done in the patent department of plaintiff. A few days before the date of application Hugh conveyed to his father the invention in question, and the father on the same day of application filed, executed a formal written assignment of the same to plaintiff. For several years afer 1910, and after he came of age, Hugh remained in plaintiff's employment, and actively assisted the patent solicitors of plaintiff in endeavoring to push the application through the Office. According to his own uncontradicted evidence he wished the patent to issue, and expected, if it was successful, to be recompensed for the same by the plaintiff, as were other inventive employees; but there is no contract proven on this subject.

Not long after his father had been superseded as general manager, the son left plaintiff's employment in the belief that his invention was not patentable; but, having confidence in his own concept, he established (against his father's advice) the Rockwell-Drake Corporation. It was not until after he had devoted much time and some capital to the development of that concern that the patent did issue to plaintiff. There is no evidence that either of the Rockwells knew of such issuance for some time after it occurred. Apparently the new venture met some measure of success, for before the beginning of this suit the Marlin Arms Company, with which defendant Rockwell had identified himself as above set forth, became the Marlin-Rockwell Company; it bought out or absorbed the Rockwell-Drake Company, and continued the business of making the patented device.

Defendant Rockwell never had anything to do with the Rockwell-Drake Company; there is no evidence that Hugh Rockwell ever complained or expressed any dissatisfaction with his conveyance while a minor to his father; he has testified, and has not stated any present dissatisfaction therewith.

The trial judge, after hearing in open court, gave the usual decree for injunction and accounting against all the defendants, who thereupon appealed.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, of New York City, Arthur L. Shipman, of Hartford, Conn., and W. Brown Morton, of New York City, of counsel), for appellants.

Gales P. Moore, of Bristol, Conn. (Mellville Church and John Thomas Smith, both of New York City, and John T. Robinson, of Hartford, Conn., of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The first defense above outlined, was pleaded as a basis for so reforming the contract of 1903 as to express the thought that plaintiff engaged (in effect) to retain defendant Rockwell in general management of its business or a great part thereof. The pleader's object was, after establishing the reformed contract, to prove a breach by the dropping of Rockwell from all high corporate place, and then to obtain, as a result of such breach by plaintiff, reconveyance or surrender of the patent in suit. In a manner and for reasons not material, the effort to obtain reformation was abandoned before trial; result is that we have here presented, as a defense only, the matter outlined in our statement of facts; there is no counterclaim or cross-bill before us.

We shall express no opinion on the question whether without reformation this defense was open to defendants; the point has not been argued, and, though suggested by some early objections to evidence, was not pressed after a prolonged trial was fairly begun. It must, however, be evident that if the testimony fails to prove mutual mistake by and between Rockwell and plaintiff, if for all that is shown the contract of 1903 is what the parties at the time intended, and especially if plaintiff has committed no breach of that agreement going to the whole contract, then defendants have failed to establish anything worthy of consideration even in foro conscientiæ, no matter what the court may think of the state of the pleadings. Without attempting a definitive statement of the meaning of the phrase "mutual mistake," we assume that defendants meant the sort of error described in Page v. Higgins, 150 Mass. 27; 22 N. E. 63, 5 L. R. A. 152; i. e., "a mistake common to all the parties to a written contract," usually relating "to a mistake concerning the contents or legal effect" of the instrument.

In 1903 defendant Rockwell was still a most influential, if not the dominant, figure in plaintiff's corporate affairs, the contract in question was drawn by the company's frequent, if not usual counsel in patent matters; there is nothing unusual or abnormal about it, and the evidence tendered consists for the most part of complaints by Rockwell of the treatment awarded him by an enormously enlarged and changed corporation 10 years or more later. We can discover no evidence even tending to show that any mistake mutual or otherwise was made in 1903; indeed, we may note that it would have been most singular, and even of doubtful legality, if the contract had sought to fasten any one man on the company as a manager or its equivalent for (apparently) the balance of his natural life.

Therefore the plaintiff had good right to "elect" to terminate Rockwell's employment. But we find that was never done; he was relegated to a position of little corporate importance compared to the places occupied by him for 20 or more earlier years; but, so far as this record shows, he is still head of the patent department and entitled to draw $5,000 a year, if he wants to. On this point we think and find that Mr. Rockwell quit, or rather drifted away from, plaintiff in anger, and regarded the stipulated salary with contempt. He assuredly did not leave because of nonpayment of salary and royalties.

[1] It is true that admitted royalties were not paid, because Rockwell refused to surrender some disputed claims to other royalties. Let it be assumed (not decided) that plaintiff was without any excuse in refusing to pay a just debt unless the creditor would in consideration of such payment settle another and wholly unrelated dispute; the breach was but partial, it related to a severable portion of the agreement, and much worse conduct has afforded no defense to a suit for patent infringement. Vacuum, etc., Co. v. Dunn, 209 Fed. 219, 126 C. C. A. 313.

We conclude this branch of the case by holding on the facts that the contract of 1903 was and is a document not shown to be affected by any mistake, and on the law that plaintiff has committed no breach thereof available to Rockwell in defense of this suit. This renders it unnecessary to consider whether if Rockwell had a defense of the kind now disposed of, it would be available to the corporate defendants.

The defense of Hugh Rockwell's infancy is untenable for several reasons:

[2] (1) Hugh himself has never to this day, so far as shown, expressed or felt any objection or regret over his conveyance to his father, and that such conveyance was at most voidable, and not void, is plain on the facts stated. The son, therefore, having never disaffirmed, so far as his father's rights are concerned, the defendant Rockwell has good title; the period of the statute of limitations having long passed before suit brought. Sims v. Everhardt, 102 U. S. 300, 26 L. Ed. 87; Wells v. Seixas (C. C.) 24 Fed. 82.

[3] (2) Even if Hugh could and did timely disaffirm as to plaintiff's title, the right is personal to him, and these defendants cannot assert it. Williston on Contracts, vol. 1, p. 451.

[4] (3) Assuming that Hugh had right or duty of affirmance or disaffirmance quoad the plaintiff, he did so affirm, after majority, by actively assisting plaintiff in getting as owner the patent in suit.

[5] It is true that years later he organized the Rockwell-Drake Company in order to exploit this invention; but he did so, not with any intent to disaffirm, but because he believed that all efforts to get a patent had failed. Wherefore he or any one else had good right to do what he did. The acts of affirmance were earlier and positive. "There is a well-recognized distinction between the nature of those acts which are necessary to avoid an infant's deed, and the character of those that are sufficient to confirm it." Irvine v. Irvine, 9 Wall. 617, 627 (19 L. Ed. 800). Acts of lesser solemnity or formality suffice for confirmation. The question is one of fact, and we find the fact to be

that Hugh Rockwell had confirmed whatever he could confirm (if anything) in the title of plaintiff before the formation of Rockwell-Drake Company.

For these reasons there is no merit in the second defense.

We find, however, error in declaring defendant Rockwell an infringer. The bill should have been dismissed as to him. He had no part in his son's Rockwell-Drake enterprise. He advised against it, and there is no proof at all that he has ever done anything more in or about the infringements of the Marlin-Rockwell Company, than has any and every other officer of that concern of equal or large authority.

[6] It is not enough to charge a corporate officer with infringement that he acted as such officer, even when the corporate business was infringement; he must be shown as acting beyond the scope of his office. Weston, etc., Co. v. Empire, etc., Co. (C. C.) 166 Fed. 867, affirmed 177 Fed. 1006, 100 C. C. A. 670; Reis v. Rosenfeld, 204 Fed. 282, 122 C. C. A. 480.

[7] That Marlin-Rockwell Company may, by receiving defendant Rockwell into its service, be equitably estopped from contesting validity of patents obtained by plaintiff from Rockwell, may be admitted as true (Mergenthaler, etc., Co. v. International, etc., Co. [D. C.] 229 Fed. 168 [17], affirmed 229 Fed. 407, 143 C. C. A. 527); but that does not make Rockwell an infringer. Affirmative acts, here totally lacking, are necessary.

We think it proper to note that, while attention to good pleading, is always economical, it would in this case, have saved much time and a great deal of expense.

Decree modified, by directing dismissal, without costs as to Rockwell, and, as modified, affirmed, without costs.