## FEDERAL TRADE COMMISSION v. STANDARD EDUCATION SOC. et al.
### No. 10.

Circuit Court of Appeals, Second Circuit.
Dec. 14, 1936.

---

W. T. Kelley, Martin A. Morrison, and James W. Nichol, all of Washington, D. C., for the Commission.

Henry Ward Beer, of New York City, for respondents.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon a petition under section 45 of title 15, U.S.Code (15 U. S.C.A. § 45) for an "enforcement order" upon an order to "cease and desist" of the Federal Trade Commission against the five respondents, two companies and three individuals. The Standard Education Society

is a company which published and sold an encyclopædia called "Standard Reference Work"; the Standard Encyclopædia Corporation is a subsidiary, or dummy, of that company. Stanford is the president and a director, and acted as general manager, of both companies, and is the owner of 250½ out of the Education Society's 536 shares of stock; Ward is the secretary, a director of both, has charge of sales and owns the same number of shares as Stanford; Greener owns the remaining thirty-five shares, and is in charge of financial matters as comptroller and auditor. On February 25, 1929, the Commission filed a complaint against the Education Society and Stanford, alleging certain unfair trade practices; they answered, and a supplemental complaint was filed on December 4, 1929, in the same terms, but joining the Encyclopædia Company and Ward and Greener, all of whom answered. Meanwhile the taking of testimony had begun on May 8, 1929, and was continued until June 20, 1930; and on the twenty-fourth of December, 1931, the Commission filed its findings of fact and the order to cease and desist now before us. In the findings it appears that the Education Society was incorporated in 1909 under another name and published and sold a work called "Aiton's Encyclopoedia," whose title was changed in 1912 to "Standard Reference Work." This was in ten volumes, intended to be kept up to date by a series of loose leaf supplements—called an "extension service"—which were to be sent to subscribers quarterly for ten years, and embodied, or assumed to embody, the latest information. Stanford, Ward and Greener organized the Encyclopædia Company in August, 1929, and changed the name of the old work to the "New Standard Encyclopædia"; but the Education Society is still disposing of some remaining sets of "The Standard Reference Work," while the Encyclopædia Company is selling the encyclopædia. The ordinary price of each is $69.50, and includes the "extension service"; when works of fiction are thrown in, as they sometimes are, the price is $89. It was the uniform practice upon taking subscriptions, for agents to tell buyers that the set of books was given away, and that only the service was paid for; it was the common practice to say that the regular price of the books and service was considerably higher than the offers, at times $150 or $200; it was not infrequently said that the work could take the place of such magazines as the Literary Digest and the Review of Reviews. The originals of some of the testimonials used in selling the books were redrafted, some had never been authorized, and some had originally been issued to cover "Aiton's Encyclopædia"; the names of some persons were advertised as contributors who had never contributed. The respondents also offered a course of instruction which they called "Special Introductory Enrollment," and for which they charged at first $98, and finally $135. The agents represented to the purchaser that these were "special introductory prices," the usual price of the course being $250; and that the special price was given to ten students only; all of which was false.

▇▇▇▇ The order to "cease and desist" included all the respondents, and forbad ten kinds of trade practices, as follows. The first clause forbad representing the ten books as given free and only the service as paid for; the second forbad representing that some of the sets were delivered to selected persons; the third was in substance the same as the first; the fourth forbad representing the work as "a recently completed, new, and up-to-date encyclopædia"; the fifth, offering the same work for sale under two names; the sixth, representing its usual price as higher than that at which it was offered; the seventh, representing any person as a contributor who was not a contributor; the eighth, representing any person as giving a testimonial who had not done so; the ninth, publishing other testimonials than those actually given; the tenth, representing the course of instruction as a "Special Introductory Enrollment" at a special reduced price. Nothing was done to enforce this order until January 20, 1936, when the petition at bar was filed; the respondents answered on the first of October, repeating the allegations of their original answer, and praying that the application be dismissed, and that "the order to cease and desist herein be vacated and set aside." Treating this part of the answer as a cross petition of the respondents to vacate the order to cease and desist, the Commission styled its brief an answer. The preliminary question of procedure so raised we will dispose of at once. We held in Federal Trade Comm. v. Balme, 23 F.(2d) 615, that upon a petition for enforcement under section 45 of title 15, U.S.Code (15 U.S.C.A. § 45), we would review the cor-

rectness of the order before considering the issue of compliance; so that once a petition to enforce the order is filed, it is not necessary for the respondent to file a petition for review. The prayer of the respondents' answer here that the order to cease and desist be vacated, was therefore entirely proper in the answer because the Commission had already invoked the preliminary inquiry; and the answer should not have been regarded as a cross petition to review the order. The Commission need not have filed any answer to it, and so far as its brief is entitled an answer, it will be stricken.

█ The first question is as to the propriety of any order whatever against the individual respondents. Stanford and Ward were jointly in complete control of both companies; as we have said, Stanford was not only president, but acted as general manager, and he was shown to have personally conducted the correspondence. Ward was sales manager, and necessarily familiar with what advertisements went out, and with the general sales policy of the company. This was enough to hold each personally for any "unfair" advertisements or sales methods, with certain exceptions to be noted later. The same is not true of Greener who, being merely the auditor and in charge of the companies' finances, would have little or nothing to do directly with trade practices. The doctrine applicable to patent infringements controls; it is not enough that an individual be a director or an officer of the infringing corporation; he must be shown to have had such connection with the wrong as would have made him an accomplice were it a crime, or a joint tortfeasor, were the corporation an individual. However, when that is done, his office will not protect him. National Cash-Register Co. v. Leland, 94 F. 502, 507–512 (C.C.A. 1); Hitchcock v. American Plate Glass Co., 259 F. 948, 952–954 (C.C.A.3); Denominational E. Co. v. Duplex E. Co., 80 F.(2d) 186, 194 (C.C.A.4). If the opinion in Dangler v. Imperial Machine Co., 11 F.(2d) 945 (C.C.A.7), means more than this, we cannot go along. Our dictum in New Departure Mfg. Co. v. Rockwell-Drake Corp., 287 F. 328, 334, was not meant to declare that so long as an official acted within the scope of his authority he was immune; the contrary had just been decided in Guarantee Vet. Co. v. Federal Trade Commission, 285 F. 853, 860 (C.C. A.2).

█ The respondents insist that the forbidden practices were not shown to have affected interstate competition. It would take little evidence to satisfy us that a company publishing, and distributing generally throughout the country, an encyclopœdia or reference work, was in competition with other similar works; perhaps we might take judicial notice of that without any evidence at all. But Stanford in substance admitted that other works competed with his, and the pleadings had foreclosed the issue anyway. The first article of the complaint alleged that the respondents were "in competition with other corporations, individuals, firms, or partnerships likewise engaged in the sale and distribution in interstate commerce of books, encyclopœdias and reference works, and so-called extension service in connection therewith." The answer of the Education Society did indeed deny that it used unfair methods of competition in interstate commerce, and that any of the methods alleged were unfair; but it did not deny that it was engaged in interstate commerce, or that there were others with whom it competed. Stanford's answer was like that of the Education Society, except that he denied "that he individually or as president * * * is in competition with other corporations." We read this as meaning merely that his relations with the Society did not charge him personally with its doings; not that if it was engaged in competition and he was chargeable with its conduct, he was not engaged in the same competition. The answer of the Encyclopoedia Company was like that of the Education Society, and Ward's answer was like Stanford's.

█ Coming now to the practices forbidden, the first and third clauses of the order were in substance the same; they forbad representing that the ten books were given away and that only the "extension service" was sold. It is true that the Commission is not to sanction unfair trade practices merely because they are of long standing; its duty is to bring trade into harmony with fair dealing. Federal Trade Comm. v. Winsted Hosiery Co., 258 U.S. 483, 493, 494, 42 S.Ct. 384, 385, 386, 66 L.Ed. 729. To the discharge of that duty it should not, however, bring a pedantic scrupulosity; too solicitous a censorship is worse than any evils it may correct, and a community which sells for profit must not be ridden on so short a rein that it can only move at a walk. We cannot take seriously the

suggestion that a man who is buying a set of books and a ten years' "extension service," will be fatuous enough to be misled by the mere statement that the first are given away, and that he is paying only for the second. Nor can we conceive how he could be damaged were he to suppose that that was true. Such trivial niceties are too impalpable for practical affairs, they are will-o'-the-wisps, which divert attention from substantial evils. Winston Co. v. Fed. Trade Comm., 3 F.(2d) 961 (C. C.A.3). It is possible to read Consolidated Book Publishers v. Fed.Trade Comm., 53 F.(2d) 942 (C.C.A.7), as holding to the contrary, but the case was complicated by a number of graver practices which probably colored the whole. We are not satisfied that stripped of these, ·the bare practice would have been held bad; if so, we prefer to follow the Third Circuit.

■■■ The second clause of the order forbad representing the work as given away to selected persons among whom the prospective buyer was one. This is supported by evidence, and is the misrepresentation of a fact, though perhaps it would not support an action of fraud. The common-law was not over-solicitous to protect an unwary buyer; but there can be no doubt that such statements give a competitive advantage to the less scrupulous seller and that they not only add nothing to the buyer's opportunities to buy wisely, but hold out to him false inducements. The Commission has a wide latitude in such matters; its powers are not confined to such practices as would be unlawful before it acted; they are more than procedural; its duty in part at any rate, is to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop. Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 647–649, 51 S.Ct. 587, 589, 590, 75 L.Ed. 1324, 79 A.L.R. 1191; Federal Trade Comm. v. R. F. Keppel & Bros., 291 U.S. 304, 310–312, 54 S.Ct. 423, 425, 426, 78 L.Ed. 814.

■■■ The fourth clause forbad calling the work a "recently completed, new, and up-to-date encyclopoedia." The findings scarcely support so broad a prohibition; the fifteenth says that the respondents have represented the "New Standard Encyclopoedia" as "something new under the sun," when it was only a revise of the old "Standard Reference Work" with new supplements to bring it up to date. Of course

nobody in his senses supposes that an encyclopoedia had not used earlier works as sources; but it seems to us that he might assume that it has been rewritten, perhaps throughout. Had the encyclopoedia professed to be no more than a new edition of the "Reference Work," a buyer might not have been justified in assuming that it was rewritten, but it professed to be a new work, and it was issued under a new name and by a new company. It was not new in the sense people would understand the word, applied to a book which came in that guise; even a substantial revision does not make a new work.

■■■ The fifth clause forbad selling the same work under two names. The order does not cover the sale of the "Standard Encyclopoedia" and the "Standard Reference Work" under their several names. Some time ago the Education Society published some sets of the "Reference Work" under the title "National Encyclopoedia," and it was proved that one buyer at least bought both for a public school, not knowing them to be the same. There was no good reason for using two names in selling the same book and the clause is reasonable enough, except for the fact that all copies of the "National Encyclopoedia" have long since been disposed of. The only possible debate is whether such a practice justifies an order when it was so far in the past; a matter which we will deal with later. We will not disturb the clause.

■■■ The sixth clause forbad saying that the price, $69.50 or $89 was·less than "the usual price." Little need be said about this; it was false and intended to deceive buyers upon a matter of fact. True, it is a very common device in selling, but it is to be discountenanced; morally it is not defensible and the Commission might hold it "unfair."

■■■ The seventh clause forbad representing as contributors or editors those who had not contributed to, or edited, the publications. Its propriety depends upon the evidence, and while there is not much of it, it definitely does appear that there was no warrant for claiming at least two, Ballou and Pace, as either contributors or editors. There were however a number who had been genuine contributors to "Aiton's Encyclopoedia," but who had done nothing later. How much of this earlier work went into the two later ones cannot be definitely ascertained, but it was the basis of them, and it seems to us not "unfair" to

announce as contributors to the derived work those who had been contributors to the original. This clause ought therefore to be modified or clarified by excepting from the prohibition contributors to "Aiton's Encyclopœdia."

The eighth and ninth clauses were related; they concerned testimonials used as advertisements. For the eighth, which forbad the use of such testimonials which had not been given by the person whose name was used, we have been able to find no support in the evidence; and we are referred to none except the conclusions of one, Nixon, which are outweighed by her identification of the handwriting of the person whose name was used. The ninth forbad the use of testimonials, which, though really given, had been garbled so as to be substantially untrue. There was evidence in support of this, and the clause was proper.

The tenth and last clause forbad representing the course of instruction as a "Special Introductory Enrollment," offered at a reduced price. There was no reduced price and so much of the clause was proper; but as to the rest it does not seem to us that the phrase indicated a selected class in the sense that particular qualifications were necessary to join it. The finding in support of this declared as well that agents had represented that the class was to be confined to ten students; and had this been included in the order, it would have been valid pro tanto; but it was not included, and it gives no support to what was.

The respondents argue as to this, and as to several other of the practices condemned, that they were traced only to agents of the companies. So far as the companies themselves are concerned this clearly made no difference; the agents did not act beyond the scope of their authority; the nineteenth finding contained no suggestion that they had been instructed not to make them. Some of them were indeed discharged because of what they said, but that does not prove that they had acted beyond the scope of their authority. The remedy is civil; responsibility may be imputed as in other civil cases. On the other hand the agents were not agents of Stanford and Ward, who are therefore responsible only for what can be traced to them personally. This consideration however affects at best only the second, sixth,

seventh, ninth and tenth clauses of the order, for certainly both Stanford and Ward must have directed what was covered by the fourth and fifth. As to the second and sixth, the practice of the agents was so universal that it seems to us that the Commission was justified in assuming that they would not have acted as they did without some direction at least from Ward, the sales manager. We are disposed to say also that, considering the centering of control in two men only, it was permissible to associate Stanford with him. Stanford was amply connected with the practices in the seventh and ninth clauses, for they appear to have been his special concern; we cannot see however that Ward was involved. As to the tenth, the evidence of the practice is very meagre and in our judgment scarcely justified a finding that either of these men personally directed the statements about the cost of the course. Therefore Stanford should not be included in the tenth clause, nor Ward in the seventh, ninth and tenth.

Finally, the respondents allege that as they had already abandoned some of the practices forbidden before the complaint was served, no order should go against them. We have already mentioned this factor in connection with the fifth clause. It has, however, often been decided—certainly when the respondent continued to oppose the order on its merits—that this is no defence to an order to cease and desist. Sears Roebuck & Co. v. Federal Trade Commission, 258 F. 307, 310, 6 A.L.R. 358 (C.C.A.7); Guarantee Veterinary Co. v. Fed. Trade Comm., supra, 285 F. 853, 859, 860; Fox Film Corp. v. Fed. Trade Comm., 296 F. 353, 357 (C.C.A.2); Arkansas Wholesale Grocers' Ass'n v. Fed. Trade Comm., 18 F.(2d) 866 (C.C.A.8); Fed. Trade Comm. v. Wallace, 75 F.(2d) 733, 738 (C.C.A.8); Armand Co. v. Fed. Trade Comm., 78 F.(2d) 707, 708 (C.C.A.2). In Winston Co. v. Fed. Trade Comm., supra, 3 F.(2d) 961, the respondent had not only abandoned the practices, but stipulated not to resume them.

The order will be modified as follows and otherwise affirmed. It will be reversed in toto as to all the respondents so far as it forbad the practices described in the first, third and eighth clauses; as to the tenth it will be reversed except as to the representations regarding price. The seventh will be modified so as to exclude from its terms contributors to "Aiton's Encyclo-

pœdia." The order will be also reversed so far as it included Stanford in the tenth clause, and Ward in the seventh, ninth and tenth; and it will be altogether reversed as to Greener. The answer of the Commission contained in its brief will be stricken. After the order has been amended in accordance with the foregoing, the proceeding will be remitted to the Commission as special master to hear and report whether the respondents have complied with the provisions which are affirmed. The cause will await in this court the return of that report for further proceedings.

Order to cease and desist modified in accordance with the foregoing; cause referred as aforesaid.