## INTERNATIONAL ART CO. v. FEDERAL TRADE COMMISSION et al.

### No. 6873.

Circuit Court of Appeals, Seventh Circuit.

Feb. 1, 1940.

Albert H. Fry, of Chicago, Ill., for petitioners.

W. T. Kelley, Martin A. Morrison, M. Marshall Morgan, and James W. Nichol, all of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to set aside a cease and desist order of the Federal Trade Commission, entered December 16, 1938, by virtue of Section 45, 15 U.S.C.A. The findings and conclusions of the Commission follow generally the allegations of the complaint. They are both of such length that they can not, with propriety, be set forth in detail.

In substance, the facts found are: Petitioners, International Art Company (herein called "Art Company") and American Discount Company (herein called "Discount Company") are separate corporations having the same office and principal place of business at 325 West Huron Street, Chicago, Illinois. They were organized by petitioner, John C. Kuck, who is president, general manager, and the owner of substantially all the stock of both corporations. The Art Company has been and is engaged in the business of offering for sale and selling tinted or colored enlargements of family and other photographs, and frames therefor. Kuck directs all activities and controls the affairs and policies of each corporation, and has general control of the representatives, agents and salesmen engaged in the operation of the business, which is conducted throughout and in many of the states. The salesmen are the ones who deal directly with the public in the soliciting and taking of orders, and work in crews under the direct supervision of what is styled as a manager or customer-manager. Each salesman is supplied by the Art Company with all blanks used in connection with the business, including a certificate certifying that the salesman is the duly accredited representative of such company. Order blanks used by the salesmen, when a sale is made, are directed and mailed to the Art Company. When the order is received and filled by the latter, it is delivered to a common carrier and shipped to its point of destination in the name of the company. In the meantime, the salesman who obtained the order has left the particular territory, and another agent known as the delivery man, with his credentials from the company, is there to receive the shipment and make delivery. He notifies the customer in the name of the company as to when personal delivery will be made to the customer's home. At that time, the contract price is collected in cash by the delivery man, or a note taken on a form furnished by the Art Company, but payable to the Discount Company. The business is conducted generally under the direction and control of Kuck.

The salesman, in connection with his sales talk, always has with him a sample picture. His object is to induce the customer to furnish a photograph of some member of the family and enter into a contract by which the Art Company agrees to paint a picture like the sample displayed. Certain false and deceptive statements are found to have been made by the salesmen by which the customer is induced to purchase. Among such are, that the sample picture has been awarded first prize, which has created a great demand therefor, and that the Art Company has arranged for its artist to paint this particular family size and, that the supply will be limited to a few people in each locality for exhibition purposes. For this reason it is represented that the purchaser will be given the picture for the actual cost of materials, or the cost of materials and delivery; that such pictures are expensive and usually sell for $30, and on some occasions the pictures are represented to have a value as high as $100; they are referred to as "oil paintings," "hand-painted" and "finely finished paintings." The prospective customer is advised that the "painting" to be furnished will be finished the same as the sample exhibited and, that the picture will be framed but that the customer need not take the frame unless desired. In instances where the "painting" to be made is of a child or baby, the salesman informs the prospective purchaser that the Chicago Tribune is preparing to hold a baby contest and that the Art Company has made an arrangement to enter its pictures in said contest. The salesman, in order to make a sale, introduces to the prospective purchaser a "draw" which consists of certain certificates en-

closed in an envelope. The drawing of a "red seal certificate" entitles the prospect to one picture for $15, and a second picture free; the drawing of a "blue seal certificate" entitles the prospect to receive two pictures for $15, or one picture for half the regular price, to-wit: $7.50. The drawing of a "green seal certificate" entitles the prospect to nothing. The salesman so manipulates the drawing that the prospect draws whatever the salesman desires. The picture, as delivered, is completely framed in a hexagon designed frame, and the purchaser is informed by the delivery man that due to the odd design, it can not be procured at any other place, and if the picture is removed from the frame it will quickly deteriorate. If the salesman succeeds in selling the frame, it is at a price ranging from $22.50 to $25.

Concerning the representations thus made, the Commission found that the picture delivered is not like the sample displayed; said sample never won a prize; sales are not limited to a selected few persons in any territory; the usual price charged by the Art Company for said pictures was $7.50; that the purchaser was not given a reduced price; that the so-called "painting" was nothing more than an enlarged photograph made up by a Chicago photographer who charged 25¢ for each enlargement; that a so-called artist colors the pictures and is able to finish twenty-five or thirty pictures per day; that the entire cost of a finished picture would not exceed $1.50; that said pictures were not "paintings" as that word is understood by artists or by the public; that the Chicago Tribune did not have a baby contest in progress or even in contemplation; that the purpose of the "draw" was to convey to the mind of the prospective purchaser that he was to receive a picture at a greatly reduced price and, that he could only realize on his successful "draw" by the purchase of a picture, and that the purchaser was induced and persuaded to purchase a frame against his will and at an exorbitant price.

When the purchaser sought relief from the fraud which had been perpetrated upon him, he was informed by the Art Company that the matter was out of its hands and the purchaser was referred to the Discount Company who was the holder of the purchaser's note. The Discount Company would advise the purchaser that it was an innocent purchaser for value, and would threaten to take legal action, warning the purchaser that this would involve $10 court costs, plus attorney fees.

It was found that firms and persons engaged in the sale of colored enlargements of photographs and frames in interstate commerce, as well as those engaged in the business of painting portraits and selling paintings, and who truthfully represented the same, are competitors of the Art Company and, that the plan adopted by such company in the sale of its product is an unfair method of competition, as well as prejudicial and injurious to the public.

Before entering into a discussion of the points raised by petitioners, it is well to have in mind the well established rule that this court, in a proceeding of this character, is not permitted to weigh or review the evidence and, that the findings of the Commission, if supported by evidence, are conclusive. Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655; Federal Trade Commission v. Standard Education Society et al., 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141.

While petitioners, under what they entitle "contested issues" attack substantially every finding made by the Commission, yet their argument is directed to only a few, to which we shall confine our discussion. Further, we think it may be stated, at least as a general proposition, that petitioners' argument is directed at the interpretation placed upon the findings rather than to the findings themselves.

The cease and desist order is directed against the Art Company, the Discount Company and John C. Kuck, and their servants, salesmen, employees and agents, and it is in connection therewith that petitioners devote a major portion of their argument. It is their contention that both companies are engaged in a separate and independent business and, that none of the so-called managers, salesmen or deliverymen is an agent of such character that his acts are binding upon the Art Company. The Commission, with reference to the question of agency, in part found: "The solicitors, salesmen, deliverymen, district managers and other representatives selling the respondent International Art Company's colored enlargements of photographs, and frames therefor, to members of the purchasing public, are agents for the International Art Company and are accepted and dealt with as such by the purchasing public. * * *"

Petitioners, with reference to this finding, state: "Every word of that finding may be true and yet the company does not have control over the actions of those salesmen, nor can the Commission make a new contract for them to give the company that power, without having the other party to the contract in court, which they did not have. * * *"

Then the argument proceeds that the construction of the term "agency" as construed by the Commission, is unwarranted. In other words, that there was no agency in the sense that the Art Company had such control over those participating in the sales plan as would make the company liable for their acts and statements. The Commission further finds regarding this same subject matter: "Based upon the testimony of customers of the International Art Company and upon general representations of the respondents made both directly and through its agents, salesmen and representatives, and also by reason of the use of the credential cards, contracts and order blanks above described, the Commission finds that the respondents as well as their salesmen and other representatives soliciting orders for pictures and frames therefor, have customarily represented that such customers are dealing direct with the respondent International Art Company and are purchasing such pictures direct from the International Art Company."

■ We have examined the evidence sufficiently to conclude that this finding not only is supported by substantial evidence, but is conclusively shown. True, there was testimony by the so-called managers and representatives to the effect the business was being conducted by them independently and, that they received no orders or directions from the Art Company. There is evidence, however, including the physical facts, which demonstrate to the contrary. For instance, each salesman was issued a certificate designating him as the representative of the Art Company; the order was taken in its name; the picture was shipped in its name, and the customer was notified in its name of the time of delivery. All blanks used by the salesmen were furnished by the Art Company and bore its name. The customer had a right to believe—in fact, could not have believed otherwise, than that the salesmen were the agents of the Art Company, with full authority in the matter.

Petitioners' argument and authorities are largely concerned with the relation between a manufacturer and a retail merchant. For example, it cites Marshall Field and Company, a store which sells the products of the American Woolen Company, and argues that the latter is not liable for representations made by the former as to the products sold. We assume, however, that Marshall Field and Company acts entirely in an independent capacity, and not as a representative of the Woolen Company. It is also sought to compare the instant situation with the relation existing between the automobile manufacturer and its local agent. This is another instance, however, of the agency conducting its business in its own right and in an independent manner. These illustrations have no analogy to the present situation. Here, the agent was clothed with apparent and, we think, real authority to speak and act for and on behalf of the principal, and the latter is bound thereby. We know of no theory of law by which the company could hold out to the public these salesmen as its representatives, reap the fruits from their acts and doings without incurring such liabilities as attach thereto.

■ In this connection, it is claimed the order should not run against the Discount Company. Again, it is argued that this company has no connection with the Art Company. The finding, however, not seriously disputed, is to the effect that both corporations had their office in the same room, with merely an aisle separating their desks. The Art Company used 325 W. Huron Street as its address, and the Discount Company, the Orleans-Huron Building as its address. Petitioner Kuck was president of both corporations and owned practically all of the stock in each. The flimsy argument is made that the Discount Company was organized for the benefit of the customers whose notes were discounted. It is plainly obvious, however, that it was for the benefit of Kuck and the Art Company. Petitioners came close to correctly appraising the situation in their answer in stating the Discount Company served "in an effort to discourage customers from setting up trumped up charges against a legitimate balance small in amount and far from the home office." At another point, reference is made to this company as a "legal fiction." No doubt it was such, the true purpose of which was to forestall a claim

made by a customer who had been a victim of the fraudulent sales plan, by pleading itself an innocent purchaser for value. We are unable to perceive any other reason for its existence. There can be no doubt but that it was a corporation without substance and, that its purpose was to aid and assist in the Art Company's plan of operation. We think it was properly included in the Commission's order.

■ The finding of the Commission that the plan by which customers were induced to purchase, including the use of the "draw," was fraudulent and deceptive, also has ample support. To our minds, the "draw" was not only an important element in a fraudulent scheme, it was fraudulent in itself. We are presented with the unique, as well as illogical argument that the sole purpose of the "draw" was a means of securing entrance into a home, determining whether the prospect had the appearance of financial responsibility, and if not, leaving without offending. True, as a matter of fact, there was no chance of gain or loss in the scheme, but the prospect was made to believe there was an element of gain, and that was plainly its purpose. The fact that the result of the "draw" made by the prospect was determined and fixed by the salesman and, that the prospect, even if lucky, had gained nothing, does not change the situation. The point is, the customer was deceived in that he was led to believe he was being presented with an opportunity to purchase a painting at a price far less than it otherwise would have been. It is no answer to say that after the customer was thus prepared, the purchase was made by reason of the exhibited sample. We think the testimony and exhibits are thoroughly convincing that the methods employed were fraudulent and deceptive and, that all who participated in the plan from Kuck, as president of the two corporations, down to and including the person who made delivery of the pictures, was a party thereto, and they all plainly come within the inhibition of the Federal Trade Act.

■ There likewise is no merit in the contention that the methods employed were not injurious to competitors or that the proceeding was not in the public's interest. The Commission properly found to the contrary. A method employed, based upon fraud and deception, whereby many persons are induced to purchase a product, is contrary to public policy and in itself is an injury, not only to actual competitors, but potential as well. Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 493, 494, 42 S.Ct. 384, 66 L.Ed. 729; Federal Trade Commission v. Raladam Co., 283 U.S. 643, 651, 652, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191; National Candy Co. v. Federal Trade Commission, 7 Cir., 104 F.2d 999, 1006. The prevention of such a method is in the public interest. Federal Trade Commission v. Royal Milling Co., 288 U.S. 212, 217, 53 S.Ct. 335, 77 L.Ed. 706.

■ It is also immaterial that competitors employ the same or similar methods. If such be the case, it would afford the basis for an argument that such competitors should be dealt with likewise, not that petitioners should escape.

The petition to set aside the order of the Commission is denied and a decree will be entered affirming the same.