**STANDARD DISTRIBUTORS,**
**Inc. et al.**
**v.**
**FEDERAL TRADE COMMISSION.**
**No. 3, Docket 22458.**

United States Court of Appeals
Second Circuit.
Argued Dec. 9, 1953.
Decided Feb. 26, 1954.

Rehearing Denied March 23, 1954.

Chase, Chief Judge, dissented in part.

Henry Ward Beer, New York City, for petitioners, LeRoy Bimstein and Standard Distributors, Inc., C. Hilding Anderson, Stephen F. Roche, Chicago, Ill., David B. Tolins and Vine H. Smith, New York City, of counsel.

William T. Kelley, Gen. Counsel, Robert B. Dawkins, Asst. Gen. Counsel, and John W. Carter, Jr., Atty., Washington, D. C., for respondent, Federal Trade Commission.

Before CHASE, Chief Judge, and L. HAND and MEDINA, Circuit Judges.

CHASE, Chief Judge (concurring in part and dissenting in part).

The petitioners, Standard Distributors, Inc., and LeRoy S. Bimstein, its president were found to have violated Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, in the sale of books and were ordered by the Commission to cease and desist.[1] They here seek to have that order set aside because the evidence was insufficient to support the findings; any violation of the statute was by agents who were acting beyond the scope of their authority; the violations found were on account of conduct which has been discontinued; the petitioners were denied due process; petitioner Bimstein should have been granted immunity under Section 9 of the Act; and Section 45(*l*) of the statute provides for the imposition of such excessive penalties that it is unconstitutional. They also rely upon the denial of their motions

---

[1]. The order required them to cease and desist from:

"(1) Representing, directly or by implication:

(a) That the New Standard Encyclopedia is a new encyclopedia;

(b) That one may obtain a set of the New Standard Encyclopedia or a reduction in the price thereof merely by writing a letter of recommendation therefor or an opinion thereon; or that any of the books sold by the respondents may be obtained by any means other than by payment of the full purchase price;

(c) That purchasers of a combination of books pay only for a part thereof;

(d) That the price at which any book or combination of books is offered is less than the price at which it will be offered later, contrary to the fact;

(e) That the quality of the binding, printing, paper or illustrations of any book, as delivered, will be equal in such respects to samples thereof exhibited to prospective purchasers, contrary to the fact;

(2) Exhibiting to prospective purchasers samples of the binding printing, paper or illustrations of such encyclopedia, supplement or any other book, which are superior in quality to the binding, printing, paper or illustrations of such books as delivered to purchasers thereof."

(a) for a bill of particulars, (b) for leave to inspect, copy or photostat certain documents and (c) for the disqualification of the trial examiner on account of bias and prejudice against them and for the substitution, after the hearings were closed, of another to review the evidence and to make a recommended decision. We shall dispose of the motions first.

The Commission charged in its complaint of August 30, 1948, that the petitioners, and two officers of the corporation, as to whom the complaint was dismissed, had acted in concert for more than seven years immediately preceding the complaint "in the sale and distribution in a combination offer, of 10 volume sets of New Standard Encyclopedia, the Quarterly Loose Leaf Extension Service supplements thereto published under the name of World Progress and also of Webster's Unabridged Dictionary, Young Folks Library, History of the World, and other books." After alleging the interstate character of the business, allegations followed to the effect that the agents of these petitioners, falsely represented to prospective customers to induce them to purchase that the encyclopedia was entirely new and not yet on public sale, that prominent and influential persons in their community had been selected to accept a certain number of sets free, or at a nominal price, previous to offering the encyclopedia for sale to the public, and questions were asked to secure information to show whether the person approached would be a likely purchaser. That information was placed on a card and the prospect asked to sign, being told that the card would be used to determine whether he would be selected to receive a free copy of the encyclopedia. A few days later another agent would call upon the prospect, show him the card he had signed and inform him that he had been selected as one of a few outstanding persons in the community to receive the encyclopedia free upon the sole condition that within sixty days after the set was received he would give this corporate petitioner a letter recommending the set or stating his opinion of

it. It would be then explained that the agent was not a salesman but had to charge one dollar to comply with legal requirements to make the gift binding upon the company. If the prospect agreed to take the set he was told the company regarded it as an exhibition set to be subject to inspection by his friends and neighbors and wanted it kept up-to-date. To do that it would be necessary for the prospect to pay for the Quarterly Loose Leaf Extension Service Supplement for ten years at from $3.95 to $8.05 per year, depending upon the type of binding chosen.

It was further alleged that the agent usually showed to the prospect what purported to be sample pages of the encyclopedia and of the supplement, showing pictures and printing on excellent paper superior to the pictures, printing and paper of the books delivered. It was alleged also that the agent falsely told the prospect that when the encyclopedia and its supplement were offered for sale to the public the charge would be $100 or some other price above the price at which they were then being offered. Other allegations were that these petitioners had made such false and misleading representations, or some of them, "in service guarantee certificates, brochures, contract forms, form letters and testimonials usually contained in the sales kits of their agents" but this allegation was not established by proof and there was no finding that the petitioners themselves made any misrepresentations in that or any other way. The complaint ended with formal allegations that the misrepresentations tended to, and had deceived a substantial portion of the purchasing public, misled it to believe them and induced it to buy the encyclopedia and supplements to its prejudice and injury, all in violation of the Federal Trade Commission Act.

Before answer, these petitioners and the other then respondents moved to dismiss the petition on the ground that the Commission was without jurisdiction in that no sufficient public interest had been alleged and, in the alternative, for a bill

of particulars and for leave to permit "the inspection and copying or photographing" of numerous documents, papers, books, cards and the like designated in seven numbered paragraphs and in a final eighth one as "Each and every document, paper, book, account, letter and other written material which constitute or contain evidence herein and/or which will be produced and/or used and/or marked for identification, and/or marked in evidence at any and all hearings on this complaint."

This motion was denied and a trial examiner was appointed to hold hearings which were held over a period of about four months at intervals in Minneapolis, Minn., Milwaukee, Wis., Chicago, Ill., Sisketon, Mo., and Washington, D. C.

█ The complaint set forth a course of conduct in making sales which was a general pattern, as it was alleged, of the sales technique employed in selling the books. It was a plain statement of what it was claimed had been done in violation of the Act and gave the then respondents reasonable notice of what they would be called upon to meet in preparing their defense. It apparently served that purpose since at none of the hearings did their counsel request any adjournment because of surprise. No greater particularity in pleading was necessary. Mansfield Journal Co. v. Federal Communications Commission, 86 U.S.App.D.C. 102, 180 F.2d 28; N. L. R. B. v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552.

█ Though at the start of the hearings counsel for the Commission made it plain, in response to an inquiry by the trial examiner, that no conspiracy was charged but only that the respondents were acting in concert with their agents in making the sales in violation of the statute and the hearings proceeded on that basis, these petitioners persist in contending that they were entitled to full particulars, examination and discovery comparable to what is customary in anti-trust cases in which conspiracy is charged. However, this proceeding neither was nor need have been based on conspiracy. Section 5(b) of the Act, 15 U.S.C.A. § 45(b), requires that when the Commission has reason to believe the Act has been violated and it appears to it that a proceeding by it is in the interest of the public it shall issue and serve a complaint "stating its charges in that respect". The complaint here complied with that and in the absence of any specific instance of surprise which prejudiced the respondents the denial of a motion for a bill of particulars was harmless. Cf. N. L. R. B. v. Pacific Gas & Electric Co., 9 Cir., 118 F.2d 780. Moreover, these were stage by stage hearings and as was said of a bill of particulars in N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 873, "it is of slight value in a trial by hearings at intervals." For the same reasons, it was not erroneous to deny the motion for leave to inspect and copy or photograph the Commission's documentary evidence or data before the hearings began.

█ An examination of the record has disclosed that the charge of bias and prejudice made against the trial examiner was so unfounded that no discussion of that in detail would serve any useful purpose. There were times when the provocative conduct of counsel for these petitioners made the preservation of orderly procedure difficult and it seems clear that the charge of bias and prejudice grew out of resentment at rulings which were reasonably required to cope with that. Moreover, it should be noticed that the Commission reviewed the evidence and made findings of its own. The motion to substitute another trial examiner was not for the purpose of having new hearings in substitution for those already held, but to have the substituted examiner review the evidence taken and submit a recommended decision which after all would have been only what its name implies and since the Commission did make findings of its own, any possible bias on the part of the trial examiner in recommending decision, and we do not mean to suggest that any was

shown, was so isolated as to be harmless. Cf. N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586.

 The Commission found that the misrepresentations charged in the complaint to have been made by agents of these petitioners were made by salesmen in selling the books and no other kind of agents were found to have made any misrepresentations. On adequate supporting evidence it was found that over a substantial period of time, over a representative area, and in substantial numbers these salesmen of the corporate petitioner made the misrepresentations for the purpose of inducing sales as charged in the complaint. There were thirty-one witnesses called by the Commission who testified to about that number of instances, and the petitioners called thirteen witnesses in an effort to refute such testimony. While the instances of misrepresentation so proved ranged through a period roughly of nine years and were comparatively small, both in numbers per year and in total numbers of sales of sets of encyclopedias which ran to over 160,000 and were made by over 2000 salesmen, they were enough to show a pattern of conduct sufficiently extensive to support the findings made by the Commission. It was for it, not for us, to pass upon the credibility of the witnesses and the weight to be given their testimony in the light of it all, conflicting or otherwise. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141; Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165. Having done so, the findings of the Commission, when, as here, the record as a whole gives them substantial support, are final even though the evidence is so conflicting that it might have supported the contrary had such findings been made. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Gooding v. Willard, 2 Cir., 209 F.2d 913.

Nevertheless, the Commission found, also on adequate evidence, that these misrepresentations were made by the corporation petitioner's salesmen in spite of efforts the petitioner made to prevent that. Those efforts included investigation of them when they were employed, extensive instruction in proper selling methods and the signing of a pledge by each salesman that he would not, under penalty of discharge for violation, represent:

"a. That the encyclopedia or other books are free.

b. That the customer is paying only for the revision (supplement) or other services.

c. That the offer is open only to a certain specified number of people in any given area or community.

d. That only a certain few are chosen or selected to receive the offer.

e. That the regular or usual price of the books or combination of books and services is greater than the price at which they are being sold when such is not the fact.

f. That the encyclopedia or other publication is an entirely new work."

Not only was this done, but the corporate petitioner sent its salesmen printed instructions to the same effect several times a year and instructed each salesman to hand to each prospective purchaser a copy of its written contract under which the books were sold [2] and to have the contract read by the prospective purchaser, or to read it to him, and to answer any questions he might ask before it was signed. Finally, in addition to their regular commission the salesmen

---

2. Immediately above the space for the signature of the purchaser were the words "Read Carefully Before Signing. Keep a Copy."

Just above that was this paragraph in heavy type.

"It is understood that nothing in this offer is free and that the price of the Encyclopedia is included in the above total. This agreement is unconditional, not subject to cancellation, and will not be affected by any agreement not endorsed hereon."

were given a bonus of $4, after the purchase price was fully paid, on each sale made but whenever a sale was cancelled the salesmen were not only penalized that bonus, but also the bonus on two paid-up sales in addition. The Commission also found that, "There is nothing in the record to indicate that respondents' [petitioners'] efforts to prevent their salesmen from making the misrepresentations which they are found to have made were not earnest and honest."

Thus there is presented a situation where the salesmen did induce sales, to the extent and effect as found, by misrepresentations which were made in violation of their instructions and despite honest efforts by the petitioners which were well calculated to prevent that.

 They were nevertheless the authorized agents of the corporate petitioner, though not of petitioner Bimstein, to sell the books. The misrepresentations they made were at least within the apparent scope of their authority and part of the inducement by which were made sales that inured to the benefit of the corporate petitioner. Unsuccessful efforts by the principal to prevent such misrepresentations by agents will not put the principal beyond the reach of the Federal Trade Commission Act. Perma-Maid Co., Inc. v. Federal Trade Commission, 6 Cir., 121 F.2d 282; Parke, Austin & Liscomb, Inc., v. Federal Trade Commission, 2 Cir., 142 F.2d 437, 440.

 Though the corporate petitioner dealt with its salesmen in compliance with Rule 16, Trade Practice Conference Rules for the Subscription and Mail Order Book Publishing Industry and used a contract which, if read, would advise the prospective purchasers of the actual facts without misleading statements that is not decisive in these proceedings. Rule 16 does imply that members of the industry who honestly comply with its letter and spirit shall not be held to have engaged in unfair practices but the rule is merely advisory and in no way deprives the Commission of statutory jurisdiction it otherwise would have. This might be relevant on the question of public interest in that the Commission might, in part because of it, conclude that where such efforts were made as here were shown to prevent misleading practices, and the instances of misrepresentation were as comparatively small as these were, the situation might remedy itself. However, the matter of public interest is one in which the discretion of the Commission is broad. Ford Motor Co. v. Federal Trade Commission, 6 Cir., 120 F.2d 175. Consideration is to be given not only to the detriment to the purchasing public from deceptive selling methods but the unfair competition with competitors which is involved and the determination of the Commission in this respect has adequate support in this record. Federal Trade Commission v. Real Products Corp., 2 Cir., 90 F.2d 617. Nor does discontinuance of the unlawful practices make the proceeding moot. Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 260, 58 S.Ct. 863, 82 L.Ed. 1326. We all agree that the order against the corporation should be enforced.

Petitioner Bimstein, though the officer of the corporate petitioner, who as its president was in what we may call over-all charge of its salesmen, was not their employer and the sales they made were not for him. This was not a sham corporation but one actually conducting a business of its own. The salesmen were its agents and not his. Their misconduct as its agents is not imputable to him as it is to their employer to make it subject to remedial orders by the Commission in furtherance of the attainment of the objectives of the Act. He acted in good faith, with due diligence, to prevent the misrepresentations made by the salesmen. This serves, I think, to distinguish his relationship to the unlawful acts of the salesmen from that of the individuals who were held in Federal Trade Commission v. Standard Education Society, supra, to be subject to a cease and desist order. They were found by the Commission to have been the man-

agers and sole stockholders of the corporation which had been organized "for the purpose of evading any order that might be issued by the Federal Trade Commission against the respondent the Standard Education Society." Thus they were shown not only to have taken no reasonable steps in good faith to prevent the violations of the statute which were found but had themselves participated in an attempt to make enforcement of the statute ineffective. And so it was held that, "Since circumstances, disclosed by the Commission's findings and the testimony, are such that further efforts of these individual respondents to evade orders of the Commission might be anticipated, it was proper for the Commission to include them in its cease and desist order."

But Bimstein has, so far as this record shows, done nothing whatever to make it reasonable to anticipate that he will make any effort to evade the order. Absent that kind of justification, I can perceive no lawful basis for an order against him personally. In so far as past conduct is an indication of what his future conduct will be, he is entitled to the inference that he will act in good faith to have the order obeyed and now to be judged accordingly. Nor will his exclusion from it leave him any choice in that regard while he is an officer responsible for the conduct of the corporate business. In that capacity, he will be bound, after notice, to take such suitable steps as lie within his power to see to it that the corporation does comply with the order. Failing that, he will be guilty of disobedience and punishable therefor. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771. But, as of now, nothing has been shown to make it lawful to stigmatize him business-wise because of the forbidden practices of the corporation's salesmen which he did his best to prevent.

For the above reasons, I think it was erroneous to include Bimstein in the cease and desist order but, as my brothers do not agree, it is affirmed as to him also for the reasons stated in the opinion of Judge L. Hand.

It has also been argued that he was entitled to immunity under Section 9 of the Act because he was subpoenaed by the Commission and testified under subpoena at the hearings before the trial examiner. As this is undoubtedly a civil proceeding which at this stage does not involve more than the determination as to whether a cease and desist order of the Commission is lawful, and shall become final, this argument in all respects is premature. Nor do we reach the question of the excessiveness of the penalties which may be imposed for violation of the order after it becomes final. There can, of course, be no violation of the order until after it does become effective and then these petitioners will have the right to a lawful hearing on any charges of violation made against them with the correlative right to raise whatever issues may be pertinent by way of defense. Not until some such violation has been proved may they be subjected to any penalty.

Petition denied and order affirmed.

L. HAND, Circuit Judge.

■ Judge Medina and I agree with Judge Chase in all that he decides and in his reasons, except as to the president of the company, Bimstein, who in our judgment should be kept in the "cease and desist" order. When the case of Federal Trade Commission v. Standard Education Society, was before us, 2 Cir., 86 F.2d 692, we refused to enforce any part of the order against one of the three incorporators, Greener, and modified it against the other two. We thought that the responsibility of each of the three turned upon whether he had been "shown to have had such connection with the wrong as would have made him an accomplice were it a crime, or a joint tort-feasor, were the corporation an individual." 86 F.2d at page 695. This the Supreme Court reversed, holding, 302 U.S. at page 119, 58 S.Ct. at page 117, that since incorporators would be bound by a cease and desist order after it was

made, and, since "further efforts of these individual respondents to evade the orders of the Commission might be anticipated, it was proper for the Commission to include them". So far, the reversal does indeed appear to have depended upon the circumstance that the incorporators had in that instance formed the company in order to avoid any action by the Commission. However, the Court proceeded, 302 U.S. at page 120, 58 S.Ct. at page 117, to say that as all three "dominated and managed" the corporation and "acted with practically the same freedom as though no corporation had existed"; they were "the actors"; and therefore the Commission was free to decide that it was necessary to include them if the order "was to be fully effective in preventing the unfair competitive practices which the Commission had found to exist."

We read this as meaning that such an order may include those officers of a corporation who are in top control of the activities that the Commission finds to have violated the Act; and two later decisions—one of them our own—have apparently also so read it.[3] It is indeed true that this results in holding such an officer responsible for the conduct of those who are not his agents; and, moreover, that it deprives him of the immunity that the incorporation of a venture ordinarily gives to the incorporators. However, we do not see that it is any severer a responsibility than that of a principal for the conduct of his agent within the scope of an "apparent authority" that he may have done his best to circumscribe. It is true that "apparent authority" has at times been said to result from estoppel; but that is not true,[4] for the principal is held, even though the third person does not rely in any way upon the authority; as, for example, in

the case of a tort. As Professor Wigmore long ago pointed out, the doctrine in such cases is a more or less rationalized vestige of altogether different notions whose provenience goes back to the archaic law of status.[5] So far as it any longer satisfies our present demands of justice, it is because, since the principal has selected the agent to act in a venture in which the principal is interested, it is fair, as between him and a third person, to impose upon him the risk that the agent may exceed his instructions—subject, indeed, to limits, vaguely left open, upon his "apparent authority."

Much the same argument seems to us to be permissible, when, as here, no agency exists. Bimstein had the entire control over what the salesmen should do and say, so far as any control was possible at all; and the order imposes no greater burden on him than it would have, if he had been a formal principal; for the salesmen did not exceed their "apparent authority." The situation is, indeed, much like that that arose under the Wagner Act, 29 U.S.C.A. § 151 et seq., before its revision, when an employer was held guilty of an "unfair labor practice," committed by employees who had acted beyond any "apparent authority."[6]

Finally, we cannot think that § 45(l) of the Act has changed this responsibility. If the law was as we think it was before that section was passed, its passage ought not to affect the preexisting scope of a "cease and desist" order. It is indeed a different question whether, if after this order has been affirmed, some of the salesmen violate it without any complicity by Bimstein, a prosecution against him under § 45(l) will lie. In that event, it will become necessary, first, to say, as matter of interpretation, whether the section covers such an occa-

3. Sebrone Co. v. Federal Trade Commission, 7 Cir., 135 F.2d 676, 678; Gelb v. Federal Trade Commission, 2 Cir., 144 F.2d 580.

4. Restatement of Agency, § 159(c).

5. Responsibility for Tortious Acts, VII Harvard Law Review, pp. 397–405; Kidd

v. Thomas A. Edison Inc., D.C., 239 F. 405; affirmed 2 Cir., 242 F. 923.

6. International Association etc. v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 519, 520, 521, 61 S.Ct. 320, 85 L.Ed. 309.

sion; second, whether, if it does, it is constitutional; and, third, whether Bimstein secured immunity by testifying. We agree that these questions do not arise now; and we would affirm the order in toto.

On Petition for Rehearing.

PER CURIAM.

The petition for rehearing is denied. The petitioners may, if so advised, apply to the Federal Trade Commission for the amendment of its order, notwithstanding our affirmance of it, to bring it into conformity with the general policy of the Commission announced in In re Walter J. Black v. Federal Trade Commission, decided on September 18, 1953.