NATIONAL TRADE PUBLICATIONS SERVICE, INC., and Melvin R. Lindsey, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 16826.

United States Court of Appeals
Eighth Circuit.

March 29, 1962.

Irving Achtenberg, Kansas City, Mo., made argument for petitioners. Counsel, Achtenberg, Sandler & Balkin, Kansas City, Mo., were on the brief.

William F. Upshaw, Atty., F. T. C., Washington, D. C., made argument for the respondent. James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, F. T. C., Washington, D. C., were with him on the brief.

Before SANBORN, MATTHES and BLACKMUN, Circuit Judges.

MATTHES, Circuit Judge.

National Trade Publications Service, Inc. and Melvin R. Lindsey, an officer of National, have petitioned us to review and set aside an order to cease and desist issued by the Federal Trade Commission. Our jurisdiction is invoked pursuant to § 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c).

Petitioners were charged with engaging in unfair, misleading and deceptive practices in the solicitation and sale of magazine subscriptions as proscribed by § 5 of the Act, 15 U.S.C.A. § 45(a).[1]

1. "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

"The Commission is empowered and directed to prevent persons, partnerships, or corporations, * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

More specifically, the complaint, filed June 17, 1959, alleged and charged:

(1) Petitioners are engaged in the sale of magazine subscriptions to the public through solicitation by agents or representatives. Petitioners supply their agents and representatives with various forms, including lists of magazines for which they are authorized to solicit subscriptions. Such agents or representatives are generally handicapped individuals.

(2) Petitioners through their sales agents or representatives have:

(a) accepted and received payment for magazines which they were not authorized to sell;

(b) collected money in excess of the regular subscription price;

(c) failed to provide the delivery of magazines they were authorized to sell;

(d) required subscribers to substitute magazines for those subscribed to and paid for and which petitioners were not authorized to sell;

(e) substituted magazines for those subscribed to and paid for without the consent of subscribers;

(f) falsely represented that subscription price or a portion thereof would be used for charitable purposes;

(g) represented, contrary to fact, that certain publications petitioners were authorized to sell were the same in content as publications which they were not authorized to sell.

(3) That use of the misleading, unfair and deceptive practices was to the prejudice and injury of the public and of petitioners' competitors and constituted unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act.

Hearings were held in Kansas City, Missouri; Detroit, Michigan; Cleveland, Ohio; and Washington, D. C. over a 7-month period from October, 1959, through April, 1960. The hearing examiner in his initial decision found the charges of the complaint had been estab-lished by the evidence and he entered an order directing petitioners to cease and desist from engaging in the practices set out above.

On appeal, the Commission reviewed the record and found, in summary, that petitioners were authorized to sell certain magazines usually by agreement with the publishers; that subscriptions were solicited through salesmen selected by "crew managers" engaged by petitioners, or in case of trade journals, through salesmen hired by petitioners. The Commission noted that fifteen consumer witnesses had testified to practices which occurred in Kansas City, Detroit and Cleveland and which with one exception, had taken place within a period of one year; that the uncontroverted testimony established that petitioners' salesmen solicited and accepted subscriptions for magazines not on the authorized list furnished by petitioners. Upon receipt of a complaint from a subscriber petitioners sent a form letter requesting the subscriber to select a substitute from the list. In some instances the subscriber reluctantly accepted a substitute; in other cases the subscriber refused and then a delay followed and an exchange of correspondence ensued with petitioners insisting that the subscriber accept a substitute. When the latter persisted in his demand for refund, petitioners would eventually comply with the demand.

The Commission further found that in addition to the consumer witnesses, the sales director of the publisher of the Kiplinger Letter testified without contradiction that over at least a three-year period, petitioners' salesmen in many parts of the country accepted initial or renewal subscriptions for the Kiplinger publication and this in face of the fact that petitioners had never been authorized to sell subscriptions to the Kiplinger Letter. That although petitioners were continually advised through telephone calls, correspondence and a personal visit by the sales director of Kiplinger of the activity of the salesmen of petitioners,

the practices continued until legal action was taken against petitioners.[2]

The Commission concluded that "The deceptive acts established in this record, occurring over the period of time and in the different locations shown, cannot be regarded as merely single, inadvertent occurrences. To the contrary, they are shown to be an integral part of the sales procedure employed by respondents [petitioners] in their solicitation and sale of magazine subscriptions. Such a course of conduct clearly constitutes an unfair and deceptive practice within the prohibition of Section 5 of the Federal Trade Commission Act."

So finding, the Commission modified the examiner's decision in certain respects not here pertinent, and as revised and modified directed petitioners to cease and desist from:

(1) accepting subscriptions for magazines or other publications for which they had no authority to solicit;

(2) requiring subscribers to substitute magazines or other publications for those subscribed for;

(3) substituting magazines or other publications for those subscribed for without the consent of the subscriber;

(4) representing directly, or by implication, that any magazine or publication which petitioners are authorized to sell is (a) the same in content as any magazine or publication which petitioners are not authorized to sell; or (b) similar to any magazine or publication which petitioners are not authorized to sell when in fact the magazines or publications are different in either content, form, coverage or any other material respect.

■■ The key controverted question for determination is whether there is substantial evidence on the whole record to support the Commission's findings and order. The specific contention is that the evidence fails to establish any pattern of deceptive practices in the solicitation of subscriptions and that at best there was proof of isolated incidents which did not establish a course of action. In this posture of the proceedings we are relieved of the necessity of an extended discussion of the numerous decisions which have considered Commission action on alleged violations of the Act. The Act provides that "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S. C.A. § 45(c). Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141 (1937). Inferences to be drawn from the evidence, "are for the Commission to determine, not the courts." Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 739, 65 S.Ct. 961, 967, 968, 89 L.Ed. 1320. Misrepresentations of fact to induce purchase of goods constitute unfair methods of competition and unfair or deceptive acts or practices in commerce—practices which by the plain terms of the Act, § 5, 15 U.S.C.A. § 45(a), are declared to be "unlawful." See and compare Federal Trade Commission v. Royal Milling Co., 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706 (1933); Federal Trade Commission v. Standard Education Society, supra, 302 U.S. 112, 58 S. Ct. 113 (1937); International Art Co. v. Federal Trade Commission, 109 F.2d 393 (7 Cir., 1940), cert. den. 310 U.S. 632, 60 S.Ct. 1078, 84 L.Ed. 1402; Parke, Austin & Lipscomb, Inc. v. Federal Trade Commission, 142 F.2d 437 (2 Cir., 1944), cert. den. 323 U.S. 753, 65 S.Ct. 86, 89 L.Ed. 603; Standard Distributors, Inc. v. Federal Trade Commission, 211 F.2d 7 (2 Cir., 1954).

We have carefully reviewed the entire record and from our analysis of the uncontradicted evidence, the conclusion is impelled that the tests and standards to be applied have been satisfied. The record demonstrates that not only did the

2. From the uncontradicted testimony of the sales manager of Kiplinger, it was established that after lengthy correspondence suit was filed by Kiplinger Washington Headquarters, Inc. against petitioners resulting in a consent decree and payment by petitioners of $700 or $800, representing subscription prices for orders which Kiplinger was required to fill.

salesmen engage in misrepresentations of fact in order to obtain subscriptions to magazines which petitioners were not authorized to solicit and accept, but that knowledge of such conduct was brought to the attention of petitioners who, instead of applying sanctions to the offending salesmen, approved the improper practices. This is plainly evidenced from the correspondence of petitioners with subscribers who had been deceived and from the printed forms they used in the conduct of their business.[3] Additionally, we note with significance that petitioners would not recognize and comply with the demand of subscribers who were unable to procure the magazines ordered until threats of legal action were made, or the matter had been referred to the Better Business Bureau.

The finding by the Commission that the practices were not isolated occurrences, but resulted from a pattern of conduct finds support in the record. Cf. Standard Distributors, Inc. v. Federal Trade Commission, supra, 211 F.2d 7. We have carefully considered Globe Readers Service, Inc. v. Federal Trade Commission, 7 Cir., 285 F.2d 692, heavily relied on by petitioners, but are not persuaded that the decision is controlling here. While there is a striking similarity to certain aspects of that case, we are convinced that there are elements shown by this record which did not exist in Globe Readers and which renders it distinguishable on the facts.

■ Petitioners also attack the order that was entered, claiming that its scope is broader than the range of the alleged violations; that it has no reasonable relation to the unlawful practices under scrutiny; and that it is indefinite in its meaning.

In Federal Trade Commission v. National Lead Co., 352 U.S. 419, 428, 77 S.Ct. 502, 509, 1 L.Ed.2d 438, the Supreme Court recognized the rule to be that: "(T)he Commission is clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist. In Jacob Siegel Co. v. Federal Trade Commission, 1946, 327 U.S. 608 [66 S.Ct. 758, 90 L.Ed. 888], the Court named the Commission 'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.'" See also Gellman v. Federal Trade Commission, 8 Cir., 290 F.2d 666, 670.

The instant order is designed to proscribe the conduct of petitioners found to constitute a violation of the Act, thus we are unable to agree that its scope is broader than the range of the violations.

The main thrust of petitioners' claim of indefiniteness is based upon consequences which may result by reason of unauthorized conduct by their salesmen. The posed hypothetical situation which petitioners suggest may rise to plague them affords no sound basis for interfering with the order as framed. As stated by the Seventh Circuit in International Art Co. v. Federal Trade Commission, 7 Cir., 109 F.2d 393, 396, cert. den. 310 U.S. 632, 60 S.Ct. 1078, 84 L.Ed. 1402: "We know of no theory of law by which the company could hold out to the public these salesmen as its representatives,

---

3. Petitioners' form letter was addressed to "Dear Subscriber" and stated a number of reasons why they were not able to provide the magazine subscribed for, e. g., "We are sorry that you have selected a magazine which is not on our authorized list. Please make a substitute selection in the same amount that you paid, from our sales list enclosed, * * *." In a blank space in the form letter petitioners wrote to subscribers of Kiplinger Letter: "We are sorry Kiplinger Letter is not on our authorized list. None of our salesmen are permitted to solicit orders. We will give your substitute selection prompt service." As the Commission found, petitioners permitted their salesmen to continue accepting subscriptions to Kiplinger Letter notwithstanding protests from Kiplinger and from persons who had subscribed through petitioners' salesmen for that publication.

reap the fruits from their acts and doings without incurring such liabilities as attach thereto." Compare also Federal Trade Commission v. National Lead Co., 352 U.S. 419, 431, 77 S.Ct. 502, 1 L. Ed.2d 438.

The order of the Commission will be affirmed. An order will be entered by this Court enforcing it in accordance with the provisions of 15 U.S.C.A. § 45 (c).